**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-0051-WJM-SKC

TODD COPE,

    Plaintiff,

v.

AUTO-OWNERS INSURANCE COMPANY,

    Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR COMPLETE SUMMARY JUDGMENT**

---

Before the Court is Defendant Auto-Owners Insurance Company's Motion for Complete Summary Judgment ("Motion"). (ECF No. 337.) Plaintiff Todd Cope filed a response. (ECF No. 352.) Defendant filed a reply (ECF No. 383) and a notice of supplemental authorities[1] (ECF No. 375). For the following reasons, the Motion is granted in part and denied in part.

**I. STANDARD OF REVIEW**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v.*

---

[1] In this notice, Defendant explains that in the Motion, it asserted arguments relying on an order that has since been reversed by the Tenth Circuit. *See Ward v. Acuity*, 2023 WL 4117502 (10th Cir. 2023). In light of the Tenth Circuit's opinion, Defendant states that it withdraws its arguments in Section III (ECF No. 337 at 21–22) of its Motion. (ECF No. 375 at 1.) Based on Defendant's notice, the Court deems the arguments in Section III of the Motion withdrawn and considers them no further in this Order.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. MATERIAL FACTS[2]

### A. Applicable Insurance Policy Provisions

Defendant issued policy number 47-026-539-02, effective November 3, 2013, to November 3, 2014, to Rocky's Auto, Inc. ("Policy"). The Policy provides in relevant part:

> **UNINSURED MOTORIST COVERAGE**
>
> \*\*\*
>
> 2. **COVERAGE**
>
> a. **We** will pay compensatory damages, including but not limited to loss of consortium, any person is legally entitled to recover from the owner or operator of an **uninsured automobile** because of **bodily injury** sustained by an injured person while **occupying** an **auto** that is covered by

---

[2] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof. These facts are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

**SECTION II – LIABILITY COVERAGE** of the policy.

The Policy also provides: "Whether an injured person is legally entitled to recover damages and the amount of such damages shall be determined by an agreement between the injured person and **us**." The Policy's limits for uninsured/underinsured motorist ("UIM") coverage is $1 million. The Policy provides that "any person making a [UIM] claim must . . . [s]ubmit to examinations by physicians **we** select as often as **we** require[.]"

B.  **Plaintiff's and the Merritts' Demand for Defendant's $1 Million UIM Limit**

On November 6, 2013, Plaintiff was involved in a car accident with Jack Landgraf while he was working as a car salesman at Rocky's Auto ("Accident"). Kenneth and Christy Merritt were passengers in the vehicle. Plaintiff received workers compensation benefits related to the Accident.

Landgraf's auto liability insurance policy with Hartford Underwriters Insurance Company had limits of $250,000 per person and $500,000 per accident. Landgraf also had a personal umbrella liability policy with $1 million limits for each occurrence. Defendant states that the total amount of liability insurance available to Plaintiff for bodily injury sustained during the Accident was $1.25 million. (ECF No. 337 at 4 ¶ 8.) Plaintiff admits Defendant's factual allegations regarding the limits of Landgraf's liability insurance but he conceptually disputes the allegation that $1.25 million was the amount available to him for bodily injury. (ECF No. 352 at 3 ¶ 8.) Instead, Plaintiff states that Landgraf's liability coverage insures Landgraf, not Plaintiff. (*Id.*) According to Plaintiff, Landgraf possessed a total of $1.5 million to cover his liability for all injuries arising out of the occurrence, of which no more than $1.25 million was available to cover his liability to Plaintiff.

On July 28, 2017, Plaintiff and the Merritts globally settled their claims arising out of the Accident against Landgraf for $1.4 million—$100,000 less than the $1.5 million in underlying liability limits available for the Accident.

On July 31, 2017, Plaintiff and the Merritts submitted a collective demand for the Policy's UIM limit of $1 million.  As of that date, neither Plaintiff nor the Merritts had informed Defendant whether the global settlement had been divided among the three claimants, and if so, how much each claimant had received individually.

C.   **Defendant Adjusts and Investigates the UIM Claims**

On August 3, 2017, Defendant requested documentation to assess Plaintiff's and the Merritts' claims, including all pleadings, disclosures, all expert reports, and other discovery from the personal injury lawsuit against Landgraf, pre- and post-accident medical records, medical bills, employment and tax records, proof of Landgraf's liability, and any other documents supporting their UIM claims.

Defendant learned that over two years before the accident, Plaintiff fell through a flight of stairs.  After the fall, Plaintiff had low back pain that radiated down his extremities.  Plaintiff underwent a lumbar spine MRI in May 2011 that revealed a "disc protrusion at L3-4 vertebral level" and "disc bulges at L4-5 and L5-S1 levels."

Two years later in 2013, Plaintiff was still being treated for low back and right leg pain he attributed to the 2011 fall.  His records stated he had "acute on chronic back pain" and "severe back and radiating pain," and that he had a "flare-up" of his back pain in February 2013. Plaintiff was treating his low back pain with physical therapy only days before the Accident.  Plaintiff claims that his low back pain after the Accident, his herniated disc at L5-S1, and his two lumbar surgeries, along with other miscellaneous treatment, were related to the Accident.

4

On September 15, 2017, Defendant notified Plaintiff and the Merritts' counsel that it intended to hire experts to provide opinions for the claim, including "a spinal surgeon to evaluate Plaintiff's claims re causation, apportionment, pre-accident conditions, and future treatment needs," an expert to assess Plaintiff's functional capacity, an expert to evaluate Plaintiff's life care plan, and multiple experts to evaluate the Merritts' claimed injuries.

On September 20, 2017, Plaintiff asked Defendant to "confirm" that the physical examination by a spine surgeon would be "the only physical exam Auto Owners Insurance will require of Mr. Cope" and setting forth additional parameters on the examination. On September 29, 2017, Plaintiff asked Defendant to "reevaluate" its decision to "require" him to undergo physical examinations.

Defendant retained spine surgeon Dr. Brian Reiss to perform an independent medical examination ("IME") and Os Baldessari to perform a functional capacity evaluation ("FCE") of Plaintiff. Dr. Reiss is a board-certified orthopedic spine surgeon with over 30 years of experience. Defendant notified Plaintiff's counsel of Dr. Reiss's and Baldessari's availability to conduct the examinations on October 17, 2017. Dr. Reiss's first availability for an examination was December 20, 2017. On October 31, 2017, Plaintiff continued to attempt to place parameters on the examinations and Defendant's examination requests.

### D. Plaintiff Sues Defendant

On November 14, 2017, while Defendant was still investigating Plaintiff's and the Merritts' UIM claims, Plaintiff sued Defendant for statutory insurance bad faith and breach of contract. Further, when Plaintiff sued Defendant, neither Plaintiff nor the Merritts had informed Defendant if and how the three claimants had divided the $1.4

million in liability benefits received.

Plaintiff underwent an IME with Dr. Reiss on January 24, 2018 and a FCE with Baldessari on December 4, 2017.  Baldessari's December 8, 2017 report found that Plaintiff was performing near his functional capacity.

On March 6, 2018, Dr. Reiss issued an IME report in which he opined that Plaintiff's low back and right lower extremity conditions were not caused by the Accident.  Dr. Reiss also found that the two back surgeries Plaintiff underwent in 2014 and 2015 were not related to the Accident and were "secondary only to his pre-existing condition."  Dr. Reiss found that Plaintiff suffered a cervical strain from the Accident and did not require further treatment.

Dr. Allison Fall performed an IME on Plaintiff on April 20, 2017 during the underlying personal injury action against Landgraf.  Dr. Fall is board-certified in physical medicine and rehabilitation, holds a Level II accreditation with Colorado's Division of Workers Compensation, and obtained Bachelor of Science degrees in biomedical engineering and mathematics prior to obtaining her medical degree.  Dr. Fall found that Plaintiff's "disc extrusion likely was not a result of the" Accident given the "mechanism of injury with him being rear-ended," that there was "no forward flexion movement at the lumbar spine" and "no immediate complaints of acute lumbar pain nor acute findings consistent with S1 radiculopathy."

On April 18, 2018, the Merritts and Plaintiff notified Defendant for the first time that they were dividing the $1.4 million equally and that they would each be receiving $466,666.67.  Plaintiff agreed to divide the settlement equally among himself and the Merritts because "it was the easiest way to do it."

**E.     Defendant Determines that Plaintiff's and the Merritts' Accident-Related Damages Do Not Exceed Landgraf's Liability Limits**

On May 8, 2018, Defendant sent correspondence to Plaintiff informing him that based on the information then available, the expert opinions provided, and a survey of relevant jury verdict reports, Defendant concluded that Plaintiff's Accident-related damages did not exceed the limit of Landgraf's liability insurance. When Defendant sent this correspondence, it was still awaiting a supplemental report from Dr. Reiss based on recently acquired images.

That same day, Defendant sent correspondence to the Merritts informing them that based on the information available, the expert opinions provided, and a survey of relevant jury verdict reports, Defendant concluded that the Merritts' accident-related damages did not exceed the limit of Landgraf's liability insurance.

Although the Merritts filed suit against Defendant in August 2018, they have since voluntarily dismissed their claims against Auto-Owners with prejudice and without receiving any UIM benefits or compensation otherwise from Defendant.

At the time Plaintiff settled his workers compensation claim related to the Accident, the total amount allowed and paid for by the workers compensation insurer for his medical treatment pursuant to the schedule approved by the Director of the Workers' Compensation Division was $121,602.48. The total amount billed was $316,832.63.

To date, Plaintiff's past medical costs he claims are related to the Accident total $337,817.16 and include all treatment costs paid during the workers compensation claim. The cost of Plaintiff's medical treatment not included as part of his workers compensation claim totals $20,984.53.

On June 29, 2018, Plaintiff's life care planning expert Aubrey Corwin opined that

7

he would need approximately $1.4 to $1.7 million to pay for future medical care. Since June 2018, according to Plaintiff, he has incurred only $6,219.68 in Accident-related medical treatment. He has attended only two medical appointments for what he claims is Accident-related care in the last two years. As of January 2023, Plaintiff had not seen any doctor for allegedly Accident-related care since January 2022 and was only taking ibuprofen.

In May 2021, Plaintiff disclosed a new life care plan from Corwin opining that he would need $419,000 to $581,000 to pay for future medical care.

Plaintiff last saw his spine surgeon Dr. Bryan Castro over four years ago in December 2018. Plaintiff has not treated with any spine surgeon other than Dr. Castro.

Defendant states that no spine surgeon has opined that it is more likely than not that Cope will require another lumbar spine surgery because of injuries sustained during the Accident. (ECF No. 337 at 10 ¶ 40.) Plaintiff disputes this characterization, responding that Dr. Castro and Dr. Roberta Anderson-Oeser have opined that while his disc herniation is now stable, it is unlikely to get better and is still causing pain symptoms. (ECF No. 352 at 6 ¶ 40.) Further, Plaintiff responds that under these circumstances, the need for further surgery is dependent on maintaining the stability of the disc. (*Id.*) He also states that Dr. Anderson-Oeser testified that further protrusion of the L5-S1 would likely require fusion surgery, and Dr. Castro admitted that such surgery was not necessarily indicated currently based on the condition of the disc and Plaintiff's ability to manage his symptoms. (*Id.*)

In August 2018, Plaintiff and his wife purchased a 40-acre horse ranch in Calhan, Colorado. At his ranch, Plaintiff has fifteen dogs, five cats, three miniature horses, two

standard horses, and a water buffalo. Defendant states that Plaintiff actively takes care of the animals on the ranch. (ECF No. 337 at 10 ¶ 41.) Plaintiff admits that he purchased the ranch and agrees with the number of animals thereon, but he states that he is limited in what he can do with respect to taking care of the animals because of his lower back pain and limitations. (ECF No. 352 at 6 ¶ 41.) Plaintiff is also able to complete activities of daily living including cooking, laundry, mopping, and cleaning the bathroom and kitchen.

Plaintiff also continues to work 40 hours per week as a security guard. Further, from June 2019 to June 2022, Plaintiff worked at Allied Security Services at RTD bus stations in downtown Denver. During that time, he consistently commuted approximately 1,000 miles per week to work.

In January 2023, Plaintiff admitted the money he obtained with his settlement with Landgraf was now "gone." He spent part of it on his ranch and the rest of it on living expenses.

On May 9, 2019, Plaintiff filed his Second Amended Complaint ("SAC"), bringing claims against Defendant for breach of insurance contract, bad faith breach of insurance contract, and violation of Colorado Revised Statutes §§ 10-3-1115(1)(A) and 10-3-1116(1). (ECF No. 99.)

### III. ANALYSIS

A. **Medical Causation and Reasonableness of Medical Bills**

Defendant argues that Plaintiff has no admissible expert evidence to establish medical causation or the reasonableness and necessity of his medical bills, and thus his UIM claim fails as a matter of law. (ECF No. 337 at 11–16.)

Defendant's argument primarily depends on the Court precluding Dr. Castro and

9

Dr. Anderson-Oeser, Plaintiff's non-retained treating physicians, from offering causation opinions at trial. In its Order Granting in Part and Denying In Part Defendant's omnibus Motion to Exclude Opinions of Certain of Plaintiff's Expert Witnesses ("Order on Defendant's Rule 702"), the Court did just that. (ECF No. 387 at 5–10.)

However, in Plaintiff's response, he states that Dr. Mark Paz, his retained expert witness who treated Plaintiff for lower back injuries sustained in the stair fall in 2011, will testify that Plaintiff's "symptoms and objective findings were qualitatively and quantitatively worse after the collision, and that the most likely cause of the L5-S1 disk protrusion and nerve impingement is the November 6, 2013 collision." (ECF No. 352 at 7–8.) Further, Plaintiff explains that "Dr. Paz's report includes specific information, including his personal knowledge, supporting his opinion that Mr. Cope's post November 6, 2013 lumbar symptoms were significantly worse and different than what he was experiencing in the aftermath of his November 2011 fall." (*Id*. at 11; ECF No. 352-8.)

In its reply, Defendant argues that Dr. Paz's proposed medical causation testimony is insufficient because it is "based only on MRI imaging and temporality of Cope's symptoms, making it unreliable." (ECF No. 383 at 8.) Additionally, Defendant argues that because Dr. Paz is not a spine surgeon, he is not qualified to give opinions about the necessity or causality of spine surgeries." (*Id.* at 8–9.)

The Court concludes that as a retained expert who has offered causation opinions in his "Medical Record Review Rebuttal," Dr. Paz may offer such opinions at trial. The Court has considered Defendant's argument that Dr. Paz is not a spine surgeon and is potentially unqualified to give opinions concerning spine surgeries but

10

concludes that such arguments go to the weight, rather than the admissibility, of his opinions.[3]  Defendant is free to cross examine Dr. Paz on such issues at trial.[4]  Therefore, because Plaintiff has demonstrated that he has sufficient evidence to withstand Defendant's challenge to his causation evidence, the Court denies this portion of the Motion.[5]

---

[3] The Court also notes that these arguments were offered for the first time in Defendant's reply, are poorly developed, and are more appropriately raised in a Rule 702 motion.  Thus, the Court considers these additional reasons to allow Dr. Paz's testimony and deny this portion of the Motion.

[4] Plaintiff also states that Dr. Dave Hnida will present testimony "demonstrating a causal link between the November 2013 motor vehicle collision and [Plaintiff's] claimed injuries."  (ECF No. 352 at 16.)  In its reply, Defendant explains that like Dr. Castro and Dr. Anderson-Oeser, Dr. Hnida is a non-retained, treating physician who did not disclose a Rule 26 expert report.  (ECF No. 383 at 7–8.)  Accordingly, for the same reasons as explained in the Order on Defendant's Rule 702 (ECF No. 387 at 5–10), the Court precludes Dr. Hnida from offering causation opinions at trial.

[5] To the extent Defendant argues that Plaintiff's failure to offer expert testimony to establish the reasonableness of his medical bills militates in favor of granting summary judgment, the Court disagrees.  (ECF No. 383 at 7.)  As an initial matter, Defendant confusingly uses the terms "medical treatment" and "medical bills" seemingly interchangeably, though they have entirely different meanings.  Additionally, in the Court's view, Defendant presented the issues of causation, necessity of medical treatment, and reasonableness of medical bills as almost inextricably intertwined and did not explain how, on its own, any deficiencies in the evidence on the issue of the reasonableness of medical bills would entitle Defendant to full summary judgment on that issue.

Further, most of the case law Defendant cites only supports the argument that any failure to offer expert testimony on the issue of *causation* would warrant summary judgment.  But Plaintiff has retained Dr. Paz to opine at least in part as to causation.  While it is true that the Court has precluded Plaintiff's non-retained, treating physicians from offering testimony as to the reasonableness of his medical bills (ECF No. 387 at 15–17), based on the cases Defendant cites in the Motion, the Court cannot conclude that Defendant is entitled to summary judgment based on this issue alone.

In *Neiberger v. Fed Ex Ground Package Sys., Inc.*, 566 F.3d 1184, 1193 (10th Cir. 2009), the Tenth Circuit stated that "[e]ven if [the plaintiff] had attempted to introduce medical bills or bill summaries into evidence, she would still have needed to establish that the associated treatment was reasonable and necessary and stemmed from the accident."  Further, the court stated that "Mrs. Neiberger was not competent to testify to the reasonable need for her treatment or to its being caused by the accident (as opposed to her preexisting scoliosis or her smoking).  These were matters for expert medical opinion."  *Id.*  These statements by the Tenth Circuit, however, jointly discuss medical causation, medical treatment, and medical expenses

11

**B.      Whether Plaintiff Has Been Fully Compensated**

Defendant argues that "Colorado law dictates that '[i]f the injured party makes a recovery of an amount that is less than the total amount of coverage available under any third-party liability insurance policy . . . there is a rebuttable presumption that the injured party has been fully compensated.'" (ECF No. 337 at 16 (citing C.R.S. § 10-1-135(3)(d)(I)).) Given the Court's conclusions, explained *infra*, Parts IV.B.1–4, the Court cannot determine as a matter of law that Plaintiff has been fully compensated by his settlement in the underlying liability action. Additionally, the Court questions whether Defendant has demonstrated that the presumption cited above definitively applies in this context (*see* ECF No. 352 at 2, 17)—yet another reason that the Court declines to apply the presumption here.

However, the Court agrees with Defendant's conclusion that to trigger UIM coverage, Plaintiff must demonstrate that his damages exceed $1.25 million—the amount of coverage available to Plaintiff in the underlying liability action. The parties dispute the proper application of two Colorado Court of Appeals decisions: *Jordan v. Safeco Ins. Co. of Am., Inc.*, 348 P.3d 443 (Colo. Ct. App. Mar. 28, 2013) and *Tubbs v.*

---

and do not explicitly state that without expert testimony to establish the reasonableness of her medical bills, the plaintiff's case should have failed.

Here, Plaintiff has offered experts who will testify as to medical causation and treatment. With respect to Plaintiff's medical bills, the undersigned has stated that "[t]here are no precedential authorities of which the Court is aware holding that the reasonable value of medical goods and services is, as a matter of federal law, necessarily beyond a lay jury's competence." *Dedmon v. Cont'l Airlines, Inc.*, No. 2016 WL 471199, at *6 (D. Colo. Feb. 8, 2016); *see also Olsen v. Owners Ins. Co.*, 2022 WL 1791098, at *5 (D. Colo. June 1, 2022), *appeal dismissed*, 2022 WL 18495982 (10th Cir. Aug. 17, 2022) (amounts of medical bills serve as some evidence of reasonable value, even without expert testimony); *Blatchley v. St. Anthony Summit Med. Ctr.*, 2018 WL 10322037, at *7 (D. Colo. Dec. 13, 2018) (noting that the medical bills themselves are some evidence of reasonable value, even without supporting expert testimony)).

*Farmers Ins. Exch.*, 353 P.3d 924 (Colo. Ct. App. May 21, 2015).  (ECF No. 352 at 13–15; ECF No. 383 at 12–15.)  Having reviewed the case law concerning *Jordan* and *Tubbs*, the Court agrees with Plaintiff that *Tubbs* applies and concludes that "a requirement that an insured exhaust a tortfeasor's liability limits is void and unenforceable under Colorado law because the UIM insurance does not cover the same injuries as the tortfeasor."  *Ligotti v. Allstate Fire & Cas. Ins. Co.*, 2023 WL 6216623, at *5 (D. Colo. Sept. 25, 2023) (citing *Tubbs*, 353 P.3d at 927).

Nevertheless, the Court disagrees with Plaintiff that he is entitled to recover UIM benefits if his compensatory damages exceed only $566,666.666.  (ECF No. 352 at 12.)  Plaintiff argues that because he recovered $466,666 in the underlying liability action, and only $100,000 remained as a gap between the $1.5 million legal liability coverage for all parties and the $1.4 million global settlement made with Plaintiff and the Merritts, then the available legal liability coverage for Plaintiff is at most $566,666.66.  (*Id.* at 15.)  Thus, he argues he is entitled to UIM benefits for any compensatory award in excess of that number, not $1.25 million.  (*Id.*)

However, Plaintiff's decision to accept $466,666.66 was a voluntary one, and Defendant has provided undisputed evidence that Plaintiff agreed to divide the settlement equally with the Merritts because "it was the easiest way to do it."  (ECF No. 337 at 8.)  Plaintiff concedes that the Colorado Uninsured Motorist statute and the Colorado Supreme Court have not "considered what the [Colorado Uninsured Motorist statute] requires in [his] situation, where the underlying liability policy was utilized to settle multiple claims—whether the 'amount of the limits' of legal liability coverage must be reduced to reflect the liability settlements of other injured parties."  (ECF No. 352 at

13

12.)  Without sufficient supporting authority provided by Plaintiff, the Court cannot conclude that the Colorado Supreme Court would reduce the amount of legal liability coverage in the manner Plaintiff suggests simply because he unilaterally decided to take a certain settlement value—particularly with no reason provided other than it was the "easiest way to do it."  Accordingly, the Court finds that Plaintiff must demonstrate that he has damages exceeding $1.25 million to trigger coverage under the UIM policy.

      1.    <u>Expert Testimony on Medical Causation and Damages</u>

Defendant argues that Plaintiff cannot meet his burden for the same reasons as set forth in Part III.A–B.  (ECF No. 337 at 17.)  Defendant argues that Plaintiff has no admissible expert evidence on medical causation or on the reasonableness of the amount of medical treatment he received or that it was necessary treatment because of accident-related injuries. (*Id.*)  Thus, Defendant argues that Plaintiff cannot overcome the presumption without such evidence.  (*Id.*)

Given the Court's conclusion that Dr. Paz may present medical causation testimony at trial, *see supra* Part III.A, this portion of Defendant's Motion is denied.

      2.    <u>Disparity Between What Plaintiff Accepted as Settlement and Benefits Available to Him</u>

Defendant underscores that Plaintiff chose to accept $466,666 as his settlement—$783,334 less than the amount of liability limits available to him.  (ECF No. 337 at 17.)  According to Defendant, "[t]he vast disparity between the amount Plaintiff chose to accept and the amount of benefits available to him proves he was fully compensated.  No reasonable person would accept hundreds of thousands of dollars less than what was available to him if he was not fully compensated by the settlement amount to which he voluntarily agreed."  (*Id.*)

Whether a plaintiff has been fully compensated for the bodily injuries he sustained in the accident is a question of fact for trial. *Smith v. Auto-Owners Ins. Co.*, 2017 WL 3223952, at *4 (D.N.M. July 27, 2017). Therefore, although what Defendant argues may very well be true, it is a disputed factual matter for the jury to resolve. The Court thus denies this portion of the Motion.

3. <u>Colorado Supreme Court's Holding in *Delta Air Lines*</u>

Defendant argues that Plaintiff's claim for past medical expenses paid by workers compensation insurance has been extinguished. (ECF No. 337 at 17 (citing *Hoden v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 4264058, at *3 (D. Colo. Sept. 20, 2021); *Delta Air Lines, Inc. v. Scholle*, 484 P.3d 695 (Colo. 2021); *Gill v. Waltz*, 484 P.3d 691 (Colo. 2021)).) In *Scholle*, the Colorado Supreme Court held that when "a workers' compensation insurer settles its subrogation claim for reimbursement of medical expenses with a third-party tortfeasor, the injured employee's claim for past medical expenses is extinguished completely." *Scholle*, 484 P.3d at 697.

Defendant relies on *Hoden*, which applies *Scholle* and *Gill* to an insurance dispute similar to the one at issue here. (ECF No. 383 at 11.) Defendant argues that although this case is a first-party case and *Scholle* and *Gill* were third-party cases, this Court should follow *Hoden* and conclude that "the procedural difference between a third-party case, like *Scholl* [sic] and *Gill*, and a first-party case, like this one, appears immaterial to the legal principle at issue." (*Id.* (citing *Hoden*, 2021 WL 4264058, at *2).) Further, Defendant contends the Court should conclude, as the court in *Hoden* did, that "[t]he point of *Scholle* and *Gill* is that, to the extent the workers' compensation settlement covers past medical expenses, Plaintiff's claim for those expenses has been extinguished." *Id*.

15

The Court agrees with the sound reasoning in *Hoden*.  Like in *Hoden*, Plaintiff filed a workers compensation claim, he settled his claim, and the workers compensation insurer paid $121,602.48 in full satisfaction of Plaintiff's past medical expenses related to his workers compensation claim arising from the accident.  (ECF No. 337 at 18.)  Thus, the Court grants this portion of the Motion and finds that Plaintiff's claim for past medical expenses covered by the workers compensation claim has been extinguished.

4. <u>Reliance on Non-Economic Damages, Impairment, and Future Medical Costs</u>

Defendant argues that Plaintiff cannot demonstrate that he has not been fully compensated by relying on non-economic damages, impairment, and future medical costs alone.  (ECF No. 337 at 21.)  While the Court agrees that it may be difficult—if not impossible—for Plaintiff to demonstrate that he has in excess of $1.25 million in damages, the Court cannot conclude as a matter of law at this stage of the litigation that it is, in fact, impossible for Plaintiff to do so.  Such a matter is for the jury to decide.  Accordingly, the Court denies this portion of the Motion.

**C.    Condition Precedent to UIM Benefits**

The parties agree that the Policy provides: "Whether an injured person is legally entitled to recover damages and the amount of such damages shall be determined by an agreement between the injured person and **us**."  (ECF No. 337 at 4; ECF No. 352 at 3.)  Defendant argues that because it is undisputed that the parties never agreed on the amount of damages, which is a condition precedent to its obligation to pay UIM benefits under the Policy, Plaintiff's breach of contract claim fails.  (ECF No. 337 at 24.)  Specifically, Defendant contends that Plaintiff's "breach-of-contract claim fails unless he can prove that Auto-Owners unreasonably handled his UIM claim by providing evidence

16

that 'clearly established' that he had $1 million in UIM exposure when he demanded limits in 2018." (*Id.* at 25.)  For support, Defendant relies on an unpublished decision from the District of Colorado, *Williams v. Auto-Owners Ins. Co.*, 2014 WL 12537030, at *2 (D. Colo. Mar. 25, 2014), *aff'd sub nom. Williams v. Owners Ins. Co.*, 621 F. App'x 914 (10th Cir. 2015).

In *Williams*, the court examined an identical insurance policy provision.  *Id.* at *3.  The plaintiff settled with the tortfeasor driver's insurance for the maximum policy limit of $25,000 but claimed to have $110,000 in unreimbursed medical costs and lost income.  *Id.* at *1.  The plaintiff's UIM policy limit was $100,000; her insurer offered her a settlement of $50,000 and then one of $75,000, but the plaintiff demanded her policy limits, and the insurer would not pay anything without a release.  *Id.* at *1–*2.  It was undisputed that the parties never reached an agreement concerning the amount of UIM benefits to which the plaintiff was entitled.  *Id.* at *3.

The *Williams* court determined that it need not decide whether the contract language was violative of public policy but noted that neither the case law relied on by the parties nor Colorado statutes declared that the policy language was void against public policy.  *Id.*  Instead, the court noted that it is "well-settled that all contracts, including contracts of insurance, contain a requirement that the parties exercise any discretion that the contract confers upon them in a manner that reflects good faith and fair dealing."  *Id.* (citing *Goodson v. Am. Standard Ins. Co.*, 89 P.3d 409, 414 (Colo. 2004)).  The court concluded that

> although the UIM coverage language permits Owners to refuse to pay benefits until the parties have reached an agreement as to the amount of those benefits that should be paid, Owners is nevertheless required to act reasonably and

> in good faith in attempting to reach an agreement with Ms.
> Williams as to that amount.[]  Thus, Owners can be liable to
> Ms. Williams for breach of contract if its failure to reach an
> agreement with her as to the amount of UIM benefits was
> the result of Owners' bad faith.

*Id.*  After analyzing the bad faith claims in the case, the court found that the plaintiff failed to come forward with evidence to demonstrate a triable question as to whether the defendant's conduct toward her was unreasonable or in bad faith.  *Id.* at *7.

Here, Defendant relies on *Williams* to argue that Plaintiff "must show that Auto-Owners unreasonably handled his UIM claim by providing evidence that 'clearly established' that he had over $1 million in UIM exposure when he demanded limits in 2018."  (ECF No. 383 at 17.)  Defendant argues in its reply that Plaintiff failed to do so in his response and thus it is entitled to summary judgment.  (*Id.*)

In his response, Plaintiff distinguishes some facts in *Williams* and vaguely argues that a policy provision precluding an insured from filing suit for breach of contract until the parties agreed on the amount the insured was entitled to would be "non-sensical" because that amount is almost always in dispute.  (ECF No. 352 at 22.)  Plaintiff concedes that in *Williams*, the analysis made sense because there the insurer agreed it owed the plaintiff *something*, whereas here, Defendant argues it owes him nothing.  (*Id.*)

The Court agrees that Plaintiff's response is decidedly less than robust.  (*See* ECF No. 352 at 21–22.)  However, it is true that *Williams* is—technically—factually distinguishable.  But what is notably more important is the fact that in 2018, Plaintiff's life care planning expert, Aubrey Corwin, estimated his future medical care would cost from $1.4 million to $1.7 million.[6]  (ECF No. 336-17 at 99.)  Additionally, the Court finds,

---

[6] Plaintiff did not point to this fact in his response, but the Court is aware of this fact based on Defendant's Rule 702 motion practice in this case (ECF No. 335 at 4) and finds it

*see infra* Part III.D, that there is a genuine dispute of material fact concerning whether Defendant acted in bad faith in this case. Given the factual distinctions between this case and *Williams*, the fact that Plaintiff had *some* evidence of almost $2 million in damages in 2018, and the Court's finding that there is a factual dispute with respect to Plaintiff's bad faith claims, the Court denies this portion of the Motion.

**D.   Bad Faith Claims**

Defendant argues that Plaintiff's bad faith claims fail for numerous reasons, including that he failed to trigger UIM coverage, and Defendant was reasonable as a matter of law, among others that the Court will not enumerate here. (ECF No. 337 at 25–31.) Despite Defendant's arguments, the Court cannot conclude in this Order as a matter of law that Plaintiff failed to trigger UIM coverage, for reasons explained above.

Moreover, the Court finds based on Levin's opinions in his expert report that a genuine dispute of material fact exists with respect to whether Defendant acted unreasonably as a matter of law in handling Plaintiff's UIM claim. (ECF No. 335-2 at 10 (explaining that in Levin's opinion, Defendant "acted unreasonably and in contravention of settled industry standards in handling Cope's claim for UIM benefits").) *See, e.g.*, *Fabian v. State Farm Mut. Auto. Ins. Co.*, 2023 WL 5179113, at *4 (D. Colo. Aug. 11, 2023) (denying summary judgment on bad faith claims based on insurance expert's standard of care opinions). Accordingly, the Court denies this portion of the Motion.

## IV. FINAL THOUGHTS

Despite the foregoing rulings, the Court agrees with Defendant that Plaintiff has a very difficult, if not impossible, hill to climb to prove to a jury that his damages exceed

---

weighs in favor of denying summary judgment on this issue.

$1.25 million—particularly when he settled for approximately $466,000 when hundreds of thousands more dollars were potentially available to him.  Moreover, it is undisputed that the Accident occurred over ten years ago, Plaintiff has already received at least $466,000 from Landgraf's insurer, and that the parties have been litigating this case since January 8, 2018—almost *six years*.

The Court, therefore, has every expectation that the parties will successfully resolve this matter before trial.  Proceeding to a nine-day jury trial in federal court to resolve this dispute would be a colossal misuse of the Court's limited resources, not to mention the significant time and expense such an undertaking would require of the parties in order to take such this dispute to trial.

## V. CONCLUSION

Accordingly, for the reasons stated, the Court ORDERS as follows:

1. Defendant's Motion (ECF No. 337) is GRANTED IN PART and DENIED IN PART as set forth above; and

2. This case remains SET for a Final Trial Preparation Conference on July 8, 2024 and a nine-day jury trial to begin on July 22, 2024 (ECF No. 367).

Dated this 12th day of December, 2023.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge